# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MONTANA

In re

**GEORGE J. MASTEL** and
**LAVERNE MASTEL**,

Debtors.

Case No. **09-60784-13**

# MEMORANDUM OF DECISION

At Butte in said District this 15th day of January, 2010.

Pending in this Chapter 13 case is confirmation of Debtors' amended Chapter 13 Plan. Objections were filed by the Chapter 13 Trustee Robert G. Drummond and by secured creditor GES, Inc. ("GES"). GES, which is co-owner of Debtors' ranch in Missoula County, Montana, also filed a motion to dismiss or convert the case to Chapter 7. After a hearing on confirmation held on November 12, 2009, the Court denied confirmation but allowed Debtors to file an amended Plan, which was filed. Objections to the amended Plan were filed by the Trustee and GES, and a hearing on confirmation and on GES's motion was held at Missoula on December 11, 2009. No additional testimony[1] was heard. Debtors were represented by Daniel S. Morgan ("Morgan") of Missoula. The Trustee and GES appeared. Attorney Brian J. Smith of Missoula representing GES. After hearing argument of counsel the Court took both matters under advisement. After review of the record and applicable law, for the reasons set forth below the objections to confirmation will be overruled and GES's motion to dismiss or convert denied by separate Order, and Debtors' amended Plan will be confirmed.

---

[1] Both Debtors testified at the November 12, 2009, hearing, which the Court deems part of the record for purposes of determining whether to confirm their amended Plan.

This Court has jurisdiction in this case under 28 U.S.C. § 1334(a).  Confirmation of Debtors' Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(L), and GES's motion to dismiss or convert is a core proceeding.  This Memorandum includes the Court's findings of fact and conclusions of law.

## FACTS

Debtors George J. Mastel ("George") and LaVerne M. Mastel ("Laverne") (together "Mastels" or "Debtors") own an undivided one-half interest in 346 acres of real property in Missoula County, Montana, in eleven (11) parcels[2].  LaVerne testified that Grant Schermer, who owns GES, is a co-owner of the 346 acres.  The Mastels operate a ranch on the 346 acres, selling hay, oats and calves in the Spring.  George testified that Mastels have lived on the real property since 1964.

George testified that 75 acres of the real property is suitable for housing development.  The 346 acres also includes some wetlands and a slough.  Debtors conveyed an easement to six businessmen for purposes of hunting on the real property.  George testified that the hunting rights earn income totaling $5,000 per year.  George testified that he attempted to create a conservation easement or trust for the real property, but that only 4 of the individuals with hunting rights agreed, while 2 refused, which prevented the conservation easement from going through.  Both LaVerne and George testified that an appraisal of their ranch was performed in 2008[3] and it was appraised at a value of $3.5 million, without taking into account the hunting rights.

LaVerne testified that they filed Chapter 12 bankruptcy cases in 1992 and 1995, and that

---

[2]A complete legal description is attached to Proof of Claim 7 filed by GES as Exhibit A.

[3]George testified that Five Valley Land Trust performed the appraisal in 2008.

2

they completed those plans. LaVerne testified that Mastels borrowed funds from GES more than 10 years after their prior Chapter 12 bankruptcy, and gave GES security in the form of a mortgage in the real property. They have made no payments to GES, but LaVerne testified that no monthly payments were due.

Debtors filed their Chapter 13 petition on May 1, 2009, and filed their Schedules, Form B22C, and Plan on May 18, 2009. Debtors' Schedules list their ranch and homestead in Missoula County on Schedule A, with a value of their interest stated in the amount of $1,500,000. Total liabilities are listed in the amount of $401,135.88. GES is listed as the largest secured creditor with a claim secured by the real property in the amount of $250,000. Schedule F lists unsecured claims in the total amount of $54,196.72.

Schedule I lists Debtors' combined monthly income from farming and ranching, social security and other in the sum of $3,383.92. Schedule J lists monthly expenses in the sum of $3,324.33, leaving $149.59 in net monthly income. Debtors' Form B22C shows that Debtors are below-median income debtors and not subject to the "Means Test." No objection has been raised to their Form B22C. The Plan proposed a "cure by sale." Debtors' original Plan provided for monthly payments of $150 for 24 months, or upon sale or refinancing of Debtors' real property when Debtors would turn over to the Trustee sufficient funds to pay all claims in full with interest. LaVerne testified that their Plan included a "drop dead" date of April 30, 2011, and if the property does not sell by that date the Trustee could liquidate the real property or convert the case to Chapter 7.

CES filed Proof of Claim No. 7 on June 4, 2009, asserting a secured claim in the amount of $242,890.45 "plus accruing fees and costs" and an annual interest rate of 5.00 percent (5%).

Claim 7 states that the value of its collateral is approximately $750,000.00. Attached to Claim 7 is a copy of the promissory note, in the amount of $219,548.37, and a mortgage signed by Mastels dated March 13, 2007. Debtors do not dispute that GES has an allowed secured claim and an undivided one-half interest in the real property. Laverne testified that the interest on GES's claim accrues at the rate of $30.08 per day, and that the total interest which would accrue after a 24 month Plan would increase GES's claim to approximately $300,000.

The first hearing on confirmation was held on November 12, 2009. The Trustee and GES filed objections. The Trustee objected that the Plan's treatment of GES was vague, and that the Debtors have not sought to employ a realtor so the Plan was not feasible[4]. GES objected on the grounds that the Plan may not be feasible because the property cannot be sold without GES's consent or a partition action.

GES filed its motion to dismiss or convert repeating its objection that the Plan is not feasible because Debtors cannot sell the real property without GES's consent. GES stated that it would not consent to a 1031 exchange, but that upon conversion to Chapter 7 GES would consent to a trustee selling Debtors' interest in the real estate to the highest bidder. Debtors objected to GES's motion to dismiss or convert contending that they can pursue a partition action, and that dismissal or conversion is not in the best interests of creditors who would be paid in full from Debtors' equity through their Plan, while only GES would receive anything if the case is dismissed or converted and the property is sold at a fire sale.

At the hearing LaVerne testified that the Debtors had not yet filed a partition action which

---

[4] The Trustee also objected on the grounds of an estimated tax claim filed by the IRS, but stated at the hearing that that objection was cured.

they needed in order to sell their interest in the real property. She explained that they held off on the partition action trying to negotiate a resolution with GES, and those concluded only very recently. George testified that Debtors could sell their one-half interest through a realtor, and that one of the individuals with hunting rights is a realtor. He testified that they have not really tried to refinance, and that he has not listed the property for sale through a realtor yet, because he was trying to find a way to avoid selling their home. George testified that GES wanted to list the property for sale at a price between $2,250,000 up to $2,500,000.

The Court denied confirmation of Debtors' first Plan at the hearing. The Court found that the Plan was vague, but allowed the Debtors to file an amended Plan "setting forth additional detail of GES's allowed claim and a roadmap of what will happen in case of contingencies such as the partition action." The Court set another hearing on confirmation for December 11, 2009. The Court found at the hearing that, based on GES's estimate of value on its claim of $750,000, its claim is protected by an equity cushion of almost triple the amount of its claim.

Debtors filed their Amended Plan (Docket No. 42) on December 3, 2009. The Amended Plan provides at paragraph 1 for monthly plan payments to the Trustee in the sum of $150.00 for 24 months, "or until all of the provisions of this Plan have been completed." Paragraph 1 then provides:

> Upon the sale or refinance of Debtors' real estate in Missoula County (either residential or bare land), Debtors will turnover sufficient proceeds for payment of the allowed administrative, secured and unsecured claims in full, plus interest as stated below. If the property does not sell before April 30, 2011, the Trustee may liquidate the property himself through a court-approved process, convert the case to Chapter 7, or dismiss the case. Further details are given below in paragraph 2(b) "Impaired Secured Claims."

Paragraph 2(b) provides further:

5

IMPAIRED SECURED CLAIMS. Neither the Trustee nor the Debtors shall make any interim payments to **GES, Inc.** during the plan term. At the closing of a sale or refinance of Debtors' real estate in Missoula County, GES, Inc. will be paid all sums due and owing pursuant to the Promissory Note and Mortgage identified in Proof of Claim number 7 filed by GES, Inc. That note provides for a petition date payoff balance of $242,890.45 and a five percent (5%) interest rate. That note also allows for attorney's fees and costs, but pursuant to Local Rules, any oversecured creditors' attorneys' fees and costs claimed must be approved by the Court under separate application.

The Debtors own an undivided half-interest in approximately 349 acres of Missoula County real property jointly with GES, Inc. The Debtors believe the property is worth $3.4 million based on a May 1, 2008 appraisal, giving their half-interest a liquidation value of at least $1.5 million or more. GES, Inc. is secured to the Debtors' half-interest, and the total amount due to GES, Inc. is approximately $250,000.00. Therefore, the equity cushion of approximately $1,250,000.00 is sufficient to fund any increasing arrearages. *See In re Siegfried*, 16 Mont. B.R. 289 (1997); *In re Murphy-Reyner*, 19 Mont. B.R. 141 (2001).

The Debtors have attempted and will continue to attempt to co-list the property for sale with GES, Inc. at $3 million or any other reasonable amount ordered by the Court. Any real estate agent hired will file an "Application to Hire Professional and Affidavit" with this Court.

The Debtors have attempted and will continue to buy out GES, Inc.'s joint ownership share and mortgage.

The Debtors have been seeking and will continue to seek private refinancing of the mortgage, or an outright sale of their half-interest.

Until such time as a sale, purchase or refinance can occur, the Debtors will initiate and pursue a partition action against GES, Inc. through the adversary process in this Court. The partition action will seek to either identify and partition equal shares of the property between the parties, or else force the appraisal and sale of some or all of the property with a splitting of the net proceeds after paying off the GES. Inc. mortgage, and paying any fees and costs allowed by the Court for partitioning the property.

If the Debtors cannot sell, refinance or partition their half-interest in real property on or before April 30, 2011, the Court can either authorize the Trustee to liquidate the property himself through a court-approved process, convert the case to Chapter 7 for liquidation by a Chapter 7 Trustee, or dismiss the case - whichever is in the best interests of the creditors.

Before any closing of a sale or refinance of any parcel of real property, Debtors will obtain payoff figures from the Trustee and authorize the closing agent to deliver sufficient funds to the Trustee for payment of any valid amount claimed by GES, Inc., along with sufficient funds to pay the unsecured claim as

    described below in paragraph 2(f) "General Unsecured Claims,"and any commissions authorized by the Court and the bankruptcy code. The Trustee will present Debtors' closing agent with payoff amounts for a preliminary Settlement Statement which will then be submitted for the Court's approval before closing.

Paragraph 2(g) of the Amended Plan is the liquidation analysis. It provides that all allowed unsecured claims will be paid, with interest.

Debtors filed a complaint for partition and sale of their interests in their ranch on December 31, 2009, in Adversary Proceeding No. 09-00109[5].

## DISCUSSION

It is well established law in this Circuit that for a bankruptcy court to confirm a plan, "each of the requirements of section 1325 must be present and the debtor has the burden of proving that each element has been met." *In re Barnes*, 32 F.3d 405, 407 (9th Cir. 1994); *In re Andrews*, 49 F.3d 1404, 1408 (9th Cir. 1995); *In re McSparran*, 410 B.R. 664, 668 (Bankr. D. Mont. 2009); *In re Tuss*, 360 B.R. 684, 690 (Bankr. D. Mont. 2007); *In re Tranmer*, 355 B.R. 234, 241 (Bankr. D. Mont. 2006). Section 1325(a)(1) requires confirmation of a plan if "the plan complies with the provisions of this chapter and with the other applicable provisions of this title." Therefore, the Debtor has the burden of proof on all elements of confirmation. *Meyer v. Hill (In re Hill)*, 268 B.R. 548, 552 (9th Cir. BAP 2001).

Since GES objects to confirmation the Debtors' Amended Plan must satisfy the requirements of § 1325(a)(5)(B)(ii) which provides that, with respect to each allowed secured claim provided for by the plan, "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such

---

[5]To date no answer has been filed.

7

claim." Under this section a Chapter 13 plan must provide for payments to secured creditors totaling no less than the present value of the secured creditors' claims. *In re Hungerford*, 19 Mont. B.R. 103, 111 (Bankr. D. Mont. 2001). The Ninth Circuit Bankruptcy Appellate Panel noted in *Trejos v. VW Credit, Inc., et al. (In re Trejos)*, 374 B.R. 210, 220 n.9 (9th Cir. BAP 2007):

> The text of § 1325(a)(5)(B)(ii) did not change under BAPCPA[6]. The phrase "as of the effective date" previously was recognized to require an interest component be paid so as to ensure that the creditor receive the present value of its claim. The Supreme Court addressed the calculation of present value interest under § 1325(a)(5)(B)(ii) in *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004), and set "prime plus" as the proper method for determining the interest rate that would provide present value. Most courts that have considered the issue have held that, since § 1325(a)(5)(B)(ii) remains unchanged under BAPCPA, *Till* remains valid under BAPCPA. Because the issue is not before us in this appeal, we save it for another day.

The Debtors' Amended Plan in the instant case does not propose a "cram down" of interest rate, and does not seek to cram down the valuation of the creditors' security under 11 U.S.C. § 506(a) and § 1325(a)(5)(B)(ii) as discussed in *Hungerford*, 19 Mont. B.R. at 111-16. Instead, the Plan provides at paragraph 2(b) that GES "will be paid all sums due and owing pursuant to the Promissory Note and Mortgage" after the sale, including interest at the 5% rate provided under the note. The Court finds that the Debtors' Amended Plan provides for payments to secured creditors totaling no less than the present value of their claims, and therefore that the Plan satisfies § 1325(a)(5)(B)(ii). *Hungerford*, 19 Mont. B.R. at 110.

A. **1325(a)(6) – Feasibility.**

GES objects to confirmation contending that Debtors' Amended Plan is not feasible because it will not consent to a sale of the real property as co-owner. Section 1325(a)(6) requires

---

[6]Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (Pub.L. 109-8) ("BAPCPA").

that "the debtor will be able to make all payments under the plan and to comply with the plan." Debtors have the burden of proving that their Plan has a reasonable chance of success. *Hungerford*, 19 Mont. B.R. at 117; *In re Schaak*, 17 Mont. B.R. 349, 357 (Bankr. D. Mont. 1999) (Chapter 12 feasibility test).

In *Hungerford* the Court noted that in a Chapter 11 case a bare proposal to pay upon the sale of property does not necessarily satisfy the feasibility requirement of § 1129(a)(11) as a matter of law. 19 Mont. B.R. at 117, citing *In re Thomas*, 241 F.3d 959, 963 (8th Cir. Ark. 2001). However, the court in *Thomas* recognized that "drop dead" provisions are entitled to be considered by a bankruptcy court when evaluating a plan's prospects for success. 241 F.3d at 963.

Debtors' Plan has a "drop dead" provision in paragraphs 1 and 2(b), which allows the Court to allow the Chapter 13 Trustee to liquidate the Debtors' real estate through a court approved process, or else convert the case to Chapter 7 or dismiss the case if the Debtors' property does not sell before April 30, 2011. The inclusion of the "drop dead" provision in Debtor's Plan weighs in favor of a finding of feasibility.

Section 1322(b)(8) allows a plan to be partially funded through the sale of property of the estate or property of a debtor, but issues of good faith, feasibility and adequate protection arise when a plan proposes only token monthly payments to the secured creditor. *In re Lindsey*, 183 B.R. 624, 627 (Bankr. D. Idaho 1995). The Debtors' Plan in the instant case proposes no monthly payments on the secured claims and a monthly payment of $150.00, so the Debtors have the burden to produce evidence as to past marketing efforts, the state of the market for the subject asset, current sale prospects, the existence and maintenance of the market for the subject asset, the existence and maintenance of any equity cushion, and all other circumstances that bear on whether

9

the creditor will see its way out of the case financially whole. *Lindsey*, 183 B.R. at 627, quoting *In re Newton*, 161 B.R. 207, 217-18 (Bankr. D. Minn. 1993).

*In re Gavia*, 24 B.R. 573, 574 (9th Cir. BAP 1982), the BAP affirmed the bankruptcy court's finding that debtors failed to satisfy the feasibility requirement. However, *Gavia* is distinguishable factually from the instant case because the Gavias had a limited equity of only $8,000 to pay all their creditors, whose debt almost equaled their equity and which they proposed to pay in full, and no evidence existed that Gavias had contacted a realtor, placed the home on the market or had any contact with any potential purchasers. 24 B.R. at 574. By contrast, in the instant case the evidence shows that the Debtors have equity in the real property almost triple the amount of GES's claim, which they do not dispute. The large amount of Debtors' equity in the real property shown by the GES's own Proof of Claim is compelling evidence of a large equity cushion which adequately protects GES over the term of the Plan. In Debtors' Plan that equity is the source of payment in full of all creditors, with interest, which this Court finds is in the best interests of creditors shown by the evidence.

It is true, as the Trustee contends, that Debtors have not filed an application for employment of a realtor to sell their interests in the real property, which weighs against them. The Court recognizes George's hesitancy to market his home, but that is what his Amended Plan provides. On the other hand the joint ownership of GES and its refusal to consent to the sale suggest that the property is not ready to be marketed[7].

The Trustee argued at the second confirmation hearing that the Amended Plan is too open-

---

[7]Given the Trustee's objections, any request by the Debtors for retroactive or nunc pro tunc approval of employment of a realtor will be critically scrutinized.

ended, there is no deadline to commence the partition action, and the Debtors have 24 months to do nothing. The Trustee's argument about the partition action is moot because the docket shows that the Debtors have commenced an adversary proceeding for partition, and summons have been issued. If Debtors do nothing for 24 months then the drop dead provision will kick in and they will lose their home.

The only evidence of sale prospects for real estate at the time of the hearing in Missoula County is George's testimony that he is confident that they can sell their real estate. No facts exists in the record to establish that sale prospects are or will remain poor through April 30, 2011, the Plan's "drop dead" date.

Summarizing feasibility, current sale prospects, and substantial equity cushion throughout the case weigh in favor of a finding that the Debtors' Plan is feasible under *Lindsey*, 183 B.R. at 627 (quoting *Newton)*, while Debtors' lack of monthly payments to the secured creditor and failure to file an employment application weigh against. On balance, the Court finds that the Debtors have satisfied their burden under § 1325(a)(6) that they will be able to make their monthly payments under the plan and to comply with the Plan, and that because of the "drop dead" clause in their Plan and substantial equity cushion, they have shown that GES has adequate protection and creditors will see their way out of the case financially whole.

**B. Partition**.

GES argues that no sale can take place without its consent and it will not consent to a sale. In the context of a bankruptcy case, 11 U.S.C. § 363(h) provides:

> Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of

11

> the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if--
>
>> (1) partition in kind of such property among the estate and such co-owners is impracticable;
>>
>> (2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;
>>
>> (3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and
>>
>> (4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

3 COLLIER ON BANKRUPTCY, ¶ 363.08, pp. 363-63 and 64 (15th ed. rev.), explaining § 363(h), states:

> Because the provision authorizes a trustee to sell and thereby deprive a nondebtor of its property, there are significant conditions to the exercise of the power.
>
> * * *
>
> The Trustee must satisfy all these requirements to conduct a sale under section 363(h). The Bankruptcy Code gives the co-owner a right to match any price offered for the property [11 U.S.C. § 363(I)]. Of course, a sale of property free of a co-owner's interest may proceed with the co-owner's consent, regardless of the condition of § 363(h).

Subsection 363.08[4], pp. 363-69 and 363-70 further discusses subsection 363(h)(1) and states:

> Before depriving a nondebtor co-owner of property under section 363(h)(1), the court must find that the property cannot be physically or legally partitioned to permit the sale of only the debtor's interest.
>
> * * *
>
> Partition of non-residential real property may be easier [than the partition of single family residences]. For example, where, among other things, an appraisal set forth separate values for separate parcels of certain farmland, partition was held

> not impracticable. [*In re Batten*, 141 B.R. 899, 905 (Bankr. W.D. La. 1992)].
>
> Even if physically practicable, partition may be "legally impracticable". *In re Spear v. Crow Canyon Office Partners (In re Haley)*, [100 B.R. 13, 15 (Bankr. N.D.Cal. 1989], the property - a complex of office buildings - was subject to a single deed of trust.  It was legally impracticable to partition the property because there was no way to allocate the secured debt between the parcel to be sold and the co-owner's parcel.

In addition to § 363(h), partition and sale of property is provided under Montana statute, MONT. CODE ANN. ("MCA") § 70-29-101 *et seq*.  Section 70-29-101 provides:

> Action for partition authorized – who may bring.  When several cotenants hold and are in possession of real property as joint tenants or tenants in common, in which one or more of them have an estate of inheritance or for life or for years, an action may be brought by one or more such persons for a partition thereof, according to the respective rights of the persons interested therein, and for a sale of such property or a part thereof if it appears that a partition cannot be made without a great prejudice to the owners.

Under Montana law the general rule is that a cotenant is entitled to partition as a matter of right, not merely as a matter of grace within the discretion of the court, but may be denied where it would be against public policy or legal or equitable principles, and may in appropriate circumstances be waived by agreement.  *Jarrett v. Jarrett*, 202 Mont. 471, 473-74, 659 P.2d 839, 840 (1983), quoting *Lawrence v. Harvey* (1980), Mont., 607 P.2d 551, 37 St. Rep. 370.

The record before the Court includes no evidence that the Mastels waived partition by agreement.  They have initiated a partition action in Adv. No. 09-00109 and joined GES, Grant E. Schermer, and others as defendants.  The complaint seeks partition and sale of the real property citing MCA § 70-29-101, *et seq*.  Summons have been issued.  The April 30, 2011, "drop dead" date in the amended Plan gives Debtors the incentive to proceed with the action for partition and sale without delay.  GES has offered no evidence or case authority which explains how it can

13

prevent partition and sale.

### C. § 1322(b)(2) – "Cure-by-Sale."

The Debtors' Plan provides for a "cure-by-sale" of Debtors' debt to GES, which this Court decided may satisfy the confirmation requirements of 11 U.S.C. § 1322(b)(3), (b)(5)[8] & (c)(1)[9]. *In re Siegfried*, 16 Mont. B.R. 289, 301 (Bankr. D. Mont. 1997). The United States District Court for the District of Montana has held that a debtor's default may be cured by sale of a residence as in *Siegfried*. *In re Murphy-Reyner*, 19 Mont. B.R. 141, 143-44 (D. Mont. 2001).

As in *Siegfried*, the Debtors' Plan provides for the payment in full of GES's allowed claim, including interest, through the sale of its. *Siegfried*, 16 Mont. B.R. at 302. The Debtors' "drop dead" date is a year shorter than the 3 year term in *Siegfried*, and their $150 plan payment is $10 more than in *Siegfried*. *Id.* at 291, 302. During the term of the Plan the record shows that GES is provided adequate protection through a substantial equity cushion over and above its allowed secured claim by the value of the Debtors' interest in the real property. Unlike in *Siegfried* the Debtors have not applied for and been granted approval of employment of a realtor. 16 Mont. B.R. at 301.

Based upon the above, this Court concludes that the Debtors' Amended Plan satisfies the requirements set forth in *Siegfried* and *Murphy-Reyner* for cure-by-sale of any default under the loan from GES. With that conclusion, GES's motion to dismiss or convert will be denied, as the

---

[8]"[A] plan may provide for the curing of a default within a reasonable time. § 1322(b)(5)." *In re Dunn*, 399 B.R. 909, 911 (Bankr. W.D. Wash. 2009).

[9]Section 1322(c)(1) provides: "Notwithstanding subsection (b)(2) and applicable nonbankruptcy law – (1) a default with respect to, or that gave rise to, a lien on the debtor's principal residence may be cured under paragraph (3) or (5) or subsection (b) until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law".

Court finds that allowing Debtors' to pay their creditors in full through a partition and sale is in the best interests of creditors and the estate.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction in this Chapter 13 case under 28 U.S.C. § 1334(a).

2. Confirmation of Debtors' Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

3. The Debtors satisfied their burden of proof on all elements of confirmation set forth at 11 U.S.C. § 1325. *Barnes v. Barnes (In re Barnes)*, 32 F.3d 405, 407 (9th Cir. 1994); *Meyer v. Hill, (In re Hill)*, 268 B.R. 548, 552 (9th Cir. BAP 2001).

4. GES failed to satisfy its burden as the moving party to show that cause exists to dismiss or convert, or that dismissal or conversion is in the best interests of creditors and the estate.

**IT IS ORDERED** separate Orders shall be entered in conformity with the above overruling the objections to confirmation filed by GES and the Chapter 13 Trustee, denying GES's motion to dismiss or convert; and confirming Debtors' amended Chapter 13 Plan filed on December 3, 2009.

BY THE COURT

/s/ Ralph B. Kirscher
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana